## 9104

### ADAMS v. GEORGIA-CAROLINA POWER CO.

#### (85 S. E. 312.)

SPECIFIC PERFORMANCE.  CERTAINTY OF CONTRACT.  RIPARIAN PROPRIE-
TOR.  TITLE TO LANDS UNDER NONTIDAL NAVIGABLE STREAMS.

1. SPECIFIC PERFORMANCE—CERTAINTY OF CONTRACT.—Where it is mate-
rial whether certain lands were included in, or excluded from, a con-
tract for sale, and the parties reached no agreement with reference
thereto, there is no contract which could be specifically enforced.

2. RIPARIAN PROPRIETOR—LANDS UNDER NONTIDAL NAVIGABLE STREAMS.—
The Court in an action between private litigants will not pass upon a
question as to the ownership of lands under the bed of nontidal
navigable streams, unless its decision would be binding upon the
parties in interest, and the right and duty to render a decision is
indisputable.

3. APPEAL AND ERROR—QUESTIONS DETERMINED.—Where specific per-
formance of a contract is denied on appeal because there was no
valid contract between the parties, the question of title to lands
involved in the contract cannot be decided.

Before WILSON, J., Edgefield, July, 1914.   Reversed.

Action by Kate M. Adams against Georgia-Carolina
Power Company.  The facts are stated in the Circuit
decree, which was, omitting the formal order for specific
performance, as follows:

This is an action for the specific performance of a con-
tract for the sale of certain lands by the plaintiff to the
defendant.  The defendant is about to complete a dam
across the Savannah River below the lands of this plaintiff,
and when completed the lands of plaintiff will be submerged
and overflowed.  Proceedings to condemn the land were
commenced by the defendant and enjoined *pendente lite* in
an action brought for that purpose by this plaintiff.  Pend-
ing the trial of this action, and before it was tried, attor-

FOOTNOTE.—As to absence of necessary parties precluding a decision
as to the validity of title to lands, see *Green* v. *Niver*, 43 S. C. 369,
21 S. E. 263.  As to certainty of contract, see *Joyner* v. *Hoffman*,
59 S. C. 528, 38 S. E. 174.

neys representing both parties hereto entered into negotiations looking to a. settlement of their differences. These negotiations were conducted by correspondence which finally resulted in a sale of plaintiff's land lying within certain lines shown on a blue print referred to in the correspondence at and for the sum of one hundred dollars per acre, by the acre.

The validity of the contract is not questioned, but both parties ask the Court to construe the evidences of the contract and declare from these evidences of it what was the true intention of the parties. There was no oral testimony offered by either party, if, indeed, such testimony would have been competent, to aid in the particular construction which either party contended for, or to prove any particular intention on the part of the contracting parties. The correspondence upon which the contract is based and which makes the contract was had between the attorneys representing each of them, and the true interpretation or construction of the contract must be arrived at from these writings—the blue print referred to in the letters and the application of certain well fixed rules of construction. The difference in construction arises out of the Savannah River boundary line. The plaintiff contends that the true boundary of her lands is the middle thread of Savannah River, and, under the contract, she is entitled to pay for the area up to this line, while the defendant contends that it only purchased to the river bank. The question at issue, therefore, is whether, under the terms of the contract, plaintiff shall receive pay for the land lying between the river's bank and its middle thread. The land was purchased for the purpose of overflowing and submerging the same, and if plaintiff owns to the middle thread of the river that construction of the contract sought by the defendant will leave her a narrow strip of river's bed cut off from her other lands by the lands of the defendant.

Preliminary to the construction of the words of the contract it becomes necessary to decide what is the true bound-

ary of plaintiff's land on Savannah River, for unless her line goes beyond the bank of the river there is no real difference between the parties.

The uncontradicted testimony is that the Savannah River at the point in question is not a navigable stream in which the tide ebbs and flows, but is a nontidal stream used by the public for floating large boats loaded with merchandise. It is technically nonnavigable, as that term is understood in the common law. Such a stream is sometimes said to be navigable in fact, though not in law, meaning that though it may be used for navigation it is not "navigable" according to the common law definition under which only those streams are navigable where the tide ebbs and flows. See *Grand Rapids & Ind. R. R. Co.* v. *Butler,* 159 U. S. 92, 15 Sup. Ct. 991; *McCullough* v. *Wall,* 38 S. C. L. 68, 4 Rich. 68; *Shands* v. *Triplett,* 26 S. C. Eq. 76, 5 Rich. Eq. 76. Under the common law the title to the bed of navigable (that is, tidal) streams is in the State or sovereign, and in nonnavigable (that is, nontidal) streams it is in the riparian proprietors. See citations above and 29 Cyc. 356, 40 Cyc. 620, and Farnham on Waters and Water Rights 249. The title then to the bed of the Savannah River, under the common law, is in the riparian proprietors.

The defendant contends that this common law rule.has been repudiated in South Carolina, and that the title to the soil underlying such of her rivers as are navigable in fact, though nontidal, is in the State, and cites the cases of *State* v. *Pacific Guano Co.,* 22 S. C. 50, and *Heyward* v. *Farmers Co.,* 42 S. C. 150, 19 S. E. 963, 28 L. R. A. 42, in support of its contention. The decisions in those cases do not abrogate the rule. They only modify it by enlarging the rights of the riparian proprietors on shallow tidal waters by declaring that they have title to the soil underlying same. Neither these cases nor any others which have been called to my attention have restricted the rights of riparian owners. In fact, the relative rights of the State and the riparian proprie-

tors in nontidal streams, such as the Savannah River, have not been modified in any respect. It is clearly stated in the McCullough case and the Shands case, *supra,* and in the case of *State* v. *Pinckney,* 22 S. C. 508, "that no authoritative decision has yet been made in this State which has changed the common law on the subject." In our Code, sec. 1928, it is declared that "all streams which have been rendered, or can hereinafter be rendered, capable of being navigated * * * are hereby declared navigable strams," but the purpose of this is to declare the public's right to the easement of navigation, and was not intended to affect the ownership of the soil.

It is also contended that the title to the bed of the Savannah River is in the United States, but I do not think there is any support for this position under the decisions. The United States claims no right in any stream other than that of controlling navigation so far as may be necessary for the regulation of commerce. See *Scott* v. *Lattig,* 33 S. Ct. Rep. 242, 227 U. S. 229, 57 L. Ed. 490, Advance Sheets of U. S. Supreme Court, February 3, 1913. The Supreme Court has repeatedly held that the title to the soil is held either by the State in which the river lies or by the riparian owner, the question being one of local law. See *United States* v. *Chandler-Dunbar Water Power Co.,* 209 U. S. 493, 28 S. Ct. 579, 14 A. & E. Ann. Cas. 1164, and a late case of same name involving the same property reported in Advance Sheets of U. S. Supreme Court on May 26, 1913.

I must, therefore, conclude that the plaintiff has title to the soil underlying the waters of the Savannah River adjoining the other part of her land out of the middle thread of the stream, subject only to the public's easement for the purpose of navigation.

Having reached the conclusion that the middle thread of the Savannah River is the true boundary line of plaintiff's land, the intention of the parties as evidenced by writings passing between their attorneys, is clear to my mind.

It is a well established rule, applicable in interpreting a description of land which gives a stream as a boundary whether such description is in words or in lines of a drawing, that the law presumes that the description is intended to include the bed of the stream out to the line of riparian proprietor's ownership, unless a clear intention to the contrary is shown.   See *McCullough* v. *Wall,* 38 S. C. L. 84, 4 Rich. L. 84; *State ex rel. Bridge Co.* v. *Columbia,* 27 S. C. 137; *Noble* v. *Cunningham,* 16 S. C. Eq. 291, McMullan Eq. 291, 5 Cyc. 892; case note, 27 A. S. R. 50; *Grand Rapids & Ind. R. R. Co.* v. *Butler,* 159 U. S. 92, 15 S. Ct. 991. This line may be a high watermark, low watermark or the center of the stream, depending usually upon the nature of the stream, or it may be some other line determined by grant. The riparian owner may convey her upland and reserve the bed of the stream as the defendant contends was done in this case, but to do so he must make such reservation very clear   In the case at bar neither the letters nor any of the other evidence show to my mind any intention to reserve the bed of the stream from the operation of the contract.   The very purpose for which the lands are to be used, to wit, the submerging and overflowing of them, clearly indicates that there was no implied reservation—there is certainly no express reservation.

The defendant contends that the quantity designated by the plat, to wit, 51.27 acres, shows an intention to exclude the river bed, because, if the river bed was included the area would be enlarged.   I do not think so, because the plaintiff in her offer of sale, which was accepted by the defendant, speaks of this as the approximate area and reserved the right to resurvey and check up the quantity.   Even had she failed to reserve the right to check up the area as shown by the blue print, she would not have been bound to accept the area there stated as final, for the sale was by the acre, and the plat submitted was nothing more than a representation by the defendant to her as to the number of acres con-

tained in the designated boundaries, which, if incorrect, would, of course, be subject to proper correction.

It is rather hard to conceive of any reason why plaintiff should reserve from the sale this strip of land entirely cut off from her other lands by the pond of defendant—every practicable use being destroyed by it. No such reservation is expressed in the contract, and the presumption of law is strongly against such reservation. To my mind the contract, instead of implying such reservation, expresses the intention of the plaintiff to sell and the defendant to buy all of the plaintiff's lands from her true boundary line on the river—which is the middle thread of the river—up to the contour lines shown on the blue print, and I hold that such is the contract between the parties.

The plaintiff asks for interest on the agreed price at seven per cent. per annum from the date of the contract. It appears that she was ready and willing to comply, and is now ready and willing to comply with the terms of the contract, and she was entitled to the payment of the purchase price on the conclusion of the contract to purchase and sell, which was June 4, 1913. She is, therefore, entitled to interest from that date at the rate of seven per cent. per annum.

It is, therefore, ordered, decreed and adjudged, etc.

From this decree the defendant appealed.

*Messrs. Sheppard Bros., Thurmond & Nicholson, Boykin Wright & Boykin Wright, Jr.,* for appellant, cite: *Defendant's charter:* 26 Stats. 398; and submit: (a) *Under the correct interpretation of the common law rule the title to the bed of a navigable fresh water stream is in the public:* 94 U. S. 324; 137 U. S. 661; 146 U. S. 387; 26 Kan. 682; 40 Am. Rep. 334; 53 Ark. 314; 22 Am. St. Rep. 197; 117 Mo. 33; 23 S. W. 104; 22 W. Va. 52; 46 Am. Rep. 499; 2 Binney (Pa.) 475; 4 Am. Dec. 465; 122 Pa. St. 191; 9 Am. St. Rep. 90; 10 Wheat. 428; 11 Pet. 175; 12 How. 443; 4 Wall. 555; 141 U. S. 1; 94 U. S. 342. *The tide*

*water test repudiated in* 95 Ala.. 116; 13 So. 289; 61 Ark.
429; 33 S. W. 641; 71 Cal. 134; 11 Pac. 873; 9 Conn. 38;
21 Am. Dec. 707; 58 So. 25; 102 Ga. 406; 29 Ind. 364;
95 Am. Dec. 644; 249 Ill. 182; 94 N. E. 134; 105 Ia. 106;
74 N. W. 935; 26 Kan. 682; 40 Am. Rep. 330; 6 Mart
(Ga.) 19; 31 Miss. 297; 17 N. W. 626; 117 Mo. 33; 23
S. W. 100; 15 Mont. 417; 39 Pac. 517; 13 Nev. 261; 13
Oregon 308; 10 Pac. 418; 122 Pa. St. 191; 9 Am. St. Rep.
88; 5 Lea 204; 40 Am. Dec. 26; 93 Tex. 591; 57 S. W.
563; 4 Call (Va.) 441; 2 Am. Dec. 574; 111 Va. 254; 68
S. E. 980; 24 Wash. 636; 40 Pac. 840; 22 W. Va. 52; 46
Am. Rep. 485. (*b*) *Under the South Carolina decisions it
should be held that the public and not the riparian owns the
fee to the bed of the Savannah River:* 1 McC. 580; 10 Am.
Dec. 699; 4 Rich. 68; 53 Am. Dec. 722; 4 Ill. 510; 38 Am.
Dec. 115; Angell on Watercourses (6th ed.), sec. 549;
5 Rich. Eq. 76; 22 S. C. 50; 10 Wall. 557; 11 Wall. 411;
22 S. C. 593; 27 S. C. 127; 3 S. E. 55; 42 S. E. 138; 19
S. E. 963.   *The Constitution of South Carolina adopts the
test of navigability in fact:* Art. I, sec. 29; art. XIV, sec 1;
Civil Code 1912, sec. 1928; 22 S. C. 83.   *The construction
of the contract a question of the law for the Court:* 26 S. C.
258; 2 S. E. 19; Devlin Deeds, secs. 837, 1028; 13 Cyc.
601; 4 Am. & Eng. Ency. of Law 830; Angell on Water-
courses (6th ed.), sec. 1517; Elliott Contracts, sec. 1517.
*And distinguish the following cases:* 1 McMul. Eq. 289; 5
Rich. Eq. 76; 79 S. E. 453; and cite: 3 Farnham on
Waters and Water Rights 2510, 2527; 29 Cyc. 371; 5
Lea (Tenn.) 204; 40 Am. Rep. 26; 6 Humph. 358.

*Messrs. Tillman & Mays* and *Grier, Park & Nicholson,*
for respondent, contend plaintiff's boundary line is the mid-
dle of the stream, and cite: 4 Rich. L. 84; 38 S. C. 84; 5
Rich. Eq. 76; 26 S. C. Eq. 76; 12 S. C. L. 579; 1 McC. L.
581; 27 S. C. 137; 82 S. C. 187; 16 S. C. Eq. 289; 4 Ill. 510;
38 Am. Dec. 112; 140 U. S. 371; 159 U. S. 92; 29 Cyc. 356;

40 Cyc. 620; 1 Farnham Waters, etc., 249; 95 S. C. 272; Tiedeman Real Property (2d ed.) 835; 39 Miss. 109; 227 U. S. 229; 22 S. C. 50; 42 S. C. 150; 1 Stat. at L. 422; 229 U. S. 53. *Compensation for plaintiff:* 67 S. C. 521; 48 S. C. 560. *Rule for construction of this contract:* 38 S. C. L. (4 Rich. L.) 84; 16 S. C. Eq. 291; 27 Am. St. Rep. 56; Gould on Waters, sec. 195; 140 U. S. 471; 159 U. S. 92; 4 Ill. 510; 38 Am. Dec. 112; 27 S. C. 137.

May 14, 1915.

The opinion of the Court was delivered by MR. JUSTICE FRASER.

This is an action for specific performance. The respondent, in her argument, thus states in part the history of the controversy:

"The defendant is a corporation organized for the purpose of erecting, operating and maintaining a plant for the manufacture and sale of electric power. Its plant is situate on Savannah River, and in order to obtain the power necessary to operate its plant, it began the erecting of a dam across the Savannah River below the lands of the plaintiff. In course of the erection of this dam, it was found that the water would be backed up so as to submerge considerable lands belonging to this plaintiff, and would water-sob other of her lands. She owned a large tract of some three hundred acres on Savannah River, and the defendant commenced proceedings to condemn so much of the same as it estimated would be affected by its dam across the river. The plaintiff questioned the right of the defendant to take her lands by condemnation and sought to have the condemnation proceedings stopped by injunction, when negotiations were opened for a settlement of the differences between the parties."

The appellant promised to take 51 27-100 acres of plaintiff's land. Both the plaintiff and defendant claimed that a contract was made by the parties and both ask for an

enforcement of the contract, as they understand it.    Both
parties claim that the contract can be gathered from certain
letters that passed between Mr. Grier, as attorney for the
plaintiff, and Mr. Wright, as attorney for the defendant.
These letters contain the whole showing, and upon them rest
the rights of the parties.

The principal question between the parties is as to the
ownership of a strip of land lying between the bank of the
Savannah River and the middle of the river.

Before specific performance can be decreed, it is first
necessary to determine whether there is a contract between
the parties or not.    If ther eis no contract, then there is
nothing to enforce.    It would be speculative for a Court to
say what would have been the rights of the parties if they
had made a contract.    The declaration of opinion would be
simply the individual opinions of the members of the Court.
Was there a contract between the parties?    The
rule is thus stated in *Spears* v. *Long,* 32 S. C. 533-
534, 11 S. E. 332.

"Without stopping to inquire whether the contract in con-
tention here was or was not of a class capable of being
enforced, it was still necessary that it should have certain
elements and incidents in order to authorize a Court of
equity to compel its performance.    The Court cannot make
a contract for the parties, or even complete an imperfect
one, and, therefore, it is indispensable that there should be
a concluded contract 'certain and explicit.'    As Mr. Pome-
roy puts it: 'The contract must be concluded, certain, unam-
biguous, natural and upon a valuable consideration; it must
be perfectly fair in all its parts, free from any misrepresenta-
tion, or misapprehension, fraud, or mistake, imposition or
surprise.'    3 Pom. Eq. Jur., sec. 1415, and notes."

In this case it gives this Court pleasure to know that the
only question is as to misapprehension and surprise.    The
only question is, did the minds of the parties meet?

When able and honorable counsel, who conducted the negotiations, come into Court on opposite sides and the one alleges that a certain tract of land was included in the contract, and the other states, with equal confidence, that it was not included, then the misapprehension is on the face of the pleadings. Here there is no variance between the pleadings and the proof on that subject.

Mr. Grier writes, in his first letter: "You, of course, recall that this letter is entirely without prejudice, and so will be your reply. In fact, we had just as well have it understood that any correspondence passing between us is to be considered by both of us without prejudice to the rights of our respective clients." To this Mr. Wright replied the next day: "My first impulse is to say in reply that any further correspondence between us on this subject, would, in my opinion, prove futile, as my client and yours are so hopelessly apart, both as to acreage and price involved. However, it certainly cannot prejudice the cause of either for me·here to give you my point of view."

Before either party can successfully claim that the other is bound by any letter that followed, it must appear that the personal character of the letters was distinctly repudiated and that the "hopeless" disagreement had become a complete understanding. The record does not show it. Those letters were written before Mr. Wright knew that Mr. Grier would contend that his client owned the bed of the river to the center of the stream. When Mr. Wright was informed by Mr. Grier that the riparian proprietor claimed title to the middle of the stream, Mr. Wright promptly writes to Mr. Grier "to say that it was a surprise and shock to me is but expressing it mildly." To this Mr. Grier in turn says, "frankly, it is somewhat a surprise to us that you raise the question," *i. e.,* plaintiff's title to the center of the stream.

Both parties stand where they stood that day. There are about twelve acres in the river. It is as clear as can be that Mr. Wright, for his client, never intended to include the

twelve acres, and that Mr. Grier, for his client, never intended to exclude it from the deed. These twelve acres constitute a material part of the sale, and since the parties did not, and do not, agree as to its ownership, their minds never met and there is no contract between the parties.

There were other matters of disagreement, but it is needless to prolong this opinion.

It is unfortunate for these parties that this Court cannot decide the real question between them, to wit, the ownership of the land lying between the bank and the middle of the stream. It is very clear that having held that there is no contract to enforce, a declaration as to what would have been the construction if a contract had been made, would not be binding on the parties, or this Court in subsequent litigation. The question as to the right of the plaintiff in this case to the twelve acres in controversy does not affect the plaintiff alone. It affects the rights of every citizen of this State who owns land lying on the navigable streams in this State, where the tide does not ebb and flow. It may affect the rights of every citizen of this "State and the United States." Under our Constitution, no Court would be justified in making a deliverance on a question of such wide and vital importance, unless its right and duty to do so is indisputable.

Judgment reversed and the parties restored to their original status.

MESSRS. CHIEF JUSTICE GARY and JUSTICES WATTS and GAGE concur in the opinion of the Court.

MR. JUSTICE HYDRICK, *dissenting*. I dissent. The plaintiff alleges that she and the defendant made a contract. The defendant admits that allegation. The correspondence between their attorneys (who were authorized to represent them in making the contract), which embodies the contract, shows that they intended to contract and did contract. But

after they had contracted a difference arose between them as to the legal effect of the contract, and that is now their only difference. They have, by proper procedure, brought that difference here, and the Court ought to decide it.